**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| **ANITA OMERIKA, personal representative for the heirs of AMRA MILETIC, deceased; and THE ESTATE OF AMRA MILETIC, by her Personal Representative, Anita Omerika,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | |
| **vs.** | **Case No.  1:12CV130 DAK** |
| **TERRY THOMPSON, Sheriff of Weber County; WEBER COUNTY, a Political Subdivision; WASATCH CORRECTIONAL MEDICAL SERVICES, PLLC; JOHN WOOD, M.D.; ANGELA EPSTEIN, PA, a Wasatch Correctional Medical Services employee; RICHARD RUSSELL, PA, a Wasatch Correctional Medical Services employee; JULIE HOLM, RN, a Weber County employee; TONYA A. SACCO, RN, a Weber County employee; ROBYN SKIDMORE, RN, a Weber County employee; BRENDA LUND, LPN, a Weber County employee; MARALEE FOSTER, LPN, a Weber County employee; LINDA GARCIA, CNA, a Weber County employee; IVETTE ZARSOZA, CNA, a Weber County employee; and DOE OFFICERS 1-10 and DOES 11-20,** | |
| **Defendants.** | |

This matter is before the court on Defendants' Motion for Summary Judgment.

Defendants are Weber County Sheriff Terry Thompson, Weber County, Wasatch Correctional

Medical Services PLLC, Dr.  John Wood, Angela Epstein, Richard Russell, Julie Holm, Tonya

Sacco, Robyn Skidmore, Brenda Lund, Maralee Foster, Linda Garcia, and Yvette Zarsoza.[1]  A

hearing on the motion was held on September 16, 2015.   At the hearing, Plaintiff was

represented by Rachel L. Sykes and Allison McAllister.[2]  Defendants were represented by Frank

D. Mylar and Andrew Hopkins.  Before the hearing, the court carefully considered the

memoranda and other materials submitted by the parties.   Since taking the matter under

advisement, the court has further considered the law and facts relating to the motion.  Now

being fully advised, the court renders the following Memorandum Decision and Order.

## I. THE PARTIES

This suit arises from the tragic and untimely death of forty-six year-old Amra Miletic

("Amra"),  who was incarcerated at the Weber County Jail from February 1 through March 20,

2011.  Plaintiff Anita Omerika is the sister-in-law and personal representative of the estate of

Amra.

Defendant John Wood, M.D., has been a contract physician for the Weber County Jail

---

[1]  In her Second Amended Complaint, Plaintiff lists Chris Nation, LPN, as a defendant within the body of the Complaint entitled "Parties."  *See* Docket No. 25 at page 9.  Mr. Nation, however, is not listed as a defendant in the caption of the Second Amended Complaint (or any of the previous iterations of the Complaint), and there is no indication that he has ever been served.  Moreover, he is not listed among the Defendants represented by Mr. Mylar, who represents all other Defendants.  To the extent Plaintiff intended to assert claims against Mr. Nation, they are dismissed for the same reasons as the claims against the other Defendants are dismissed.

[2]  Anita Omerika, who will be referred to as "Plaintiff" in this Memorandum Decision and Order, brought this action as the personal representative for the heirs of Amra Miletic and as personal representative of her estate.

for nearly twenty-five (25) years.  He has been board certified in Family Medicine since 1980 and has been board certified in Hospice and Palliative Care since 2008.   He is also the owner and sole principle of the Defendant Wasatch Correctional Medical Services, PLLC.

Defendants Angela Epstein and Richard Russell are both physician's assistants.  Epstein worked for Wasatch Correctional Medical Services, and Russell continues to work there.  They both provided services at the Weber County Jail during the time that Amra was a detainee there.

Defendant Tonya Sacco is a registered nurse and has worked at the Weber County Jail for approximately five years.  Defendant Julie Holm is a registered nurse who worked at the Weber County Jail for approximately ten (10) years.  Defendant Robyn Skidmore is a registered nurse who has worked at the Weber County Jail for approximately twelve (12) years.   All worked at the jail during the time that Amra was a detainee there.

Defendant Brenda Lund is a licensed practical nurse who worked at the Weber County Jail for over six (6) years.  Defendant Maralee Foster is also a Licensed Practical Nurse who has worked at the Weber County Jail for approximately eight (8) years.  Both worked at the jail during the time that Amra was a detainee there.

Defendant Linda Garcia is a certified nursing assistant who has worked at the Weber County Jail for nearly eight (8) years.  Defendant Yesenia Ivette Zarsoza is also a certified nursing assistant who worked at the Weber County Jail for approximately six (6) years.  Both worked at the jail during the time that Amra was a detainee there.

Defendant Chief Deputy Kevin Burton was–and still is–the Weber County Jail Commander, having been appointed in May 2006.  Defendant Sheriff Terry Thompson is the duly elected Sheriff of Weber County.  He took office in January 2011.  He has been employed by the Weber County Sheriff's Office for more than twenty-five (25) years.

## II.  UNDISPUTED FACTS[3]

On February 1, 2011, Amra was taken into custody by U.S. Immigration and Customs Enforcement ("ICE").  Amra was a Bosnian refugee and a legal U.S. resident.  According to her prior medical records, her medical history included congestive heart failure, hyperthyroidism, Post Traumatic Stress Disorder, liver failure, and accumulation of fluid in the abdominal cavity. While she was in ICE custody on February 1, 2011, Amra requested medical attention, complaining of nausea, vomiting, and diarrhea throughout the night.  She also stated that she

---

[3]  In responding to Defendants' Statement of Undisputed Facts, Plaintiff has generally failed to cite to specific materials in the record.  Plaintiff often simply "denies" a fact or states that she is without sufficient knowledge to admit or deny the fact.  She also often responds by making legal arguments, such as arguing what a particular defendant should have done, but fails to provide any supporting evidence.  Plaintiff also claims that various statements quoted by Defendants from depositions or affidavits are statements of "mere belief" that must be disregarded at the summary judgment stage, which in many circumstances, is not accurate given the specific legal standards relevant to the claims in this case.

Although Plaintiff has failed to properly cite to record evidence to create a dispute regarding Defendants' purported undisputed facts, Plaintiff subsequently recites her own facts, which, in a few circumstances, could be construed to provide some evidence that contradicts Defendants' stated facts.  Consequently, the court's task of determining whether genuine issues of material fact exist has been laborious.  In deciding this motion, the court has attempted to accurately determine whether genuine issues of material fact exist–even if they were not set forth in a procedurally proper manner.  However, as a separate and independent basis for granting summary judgment, the court finds that Defendants' facts are deemed admitted.

had had chest pain and blood in her stool during the night.   She was taken by ambulance to

University of Utah Hospital Emergency Room.   At the hospital, she denied any chest pain or

bloody stools, and the records show that there was no blood in her stools.   The University

Hospital diagnosed her with "nausea and vomiting" and instructed her to follow up with her

primary care provider within 3-5 days and to return to the emergency department as needed

with any new or worsening symptoms.

Immediately following her discharge from the hospital, the federal agents brought

Amra to the Weber County Jail to be booked on an immigration hold.   Generally, when an

inmate is cleared by a hospital, it is Dr. Wood's understanding that the patient does not need

urgent or emergency care and does not need the type of care that is provided by a hospital.

Rather, such a patient's medical condition is such that the patient could go to her home if not

taken to the jail.

The usual procedure at the Weber County Jail is that the jail booking staff provides a

cursory medical intake of all inmates when they are booked.   The nursing staff provides a more

substantive medical intake, which is followed up by an even more substantive evaluation after

the inmate has been in the jail a couple of weeks.   These evaluations are the jail's attempt to

discover and provide care for the medical needs of the inmates.   Any significant concerns are

reported to Dr. Wood or one of his physician's assistants so that appropriate care can be

provided.   During the jail intake procedures, nursing staff identify and verify prescription

medications.   All necessary medications are continued although they may be in a different

5

form, such as a generic medication rather than a brand name, or a similar type of medication

that is not as subject to abuse within a correctional environment.[4]

When Amra was booked on February 1, 2011, her "Inmate Property Inventory Sheet"

indicated that she was in possession of twenty-six (26) 20-mg potassium tablets, nine (9) 10-mg

potassium tablets, forty-five (45) 300-mg lithium carbonate tablets, one (1) 40-mg furosemide

tablet, twenty (20) 25-mg atenolol tablets, and an empty bottle of 15-mg mirtazepine.   The

screening officer checked "NO" for current medical/mental health problems and currently

prescribed medications; checked "YES" for recent illness of vomiting and fever; and checked

"NO" for referral to medical/mental health.

Defendant Foster, a licensed practical nurse, conducted Amra's medical intake

screening on February 1, 2011, after Amra was booked into the jail.  Foster reviewed Amra's

medical discharge records from the University hospital and called Amra's pharmacy to verify

---

[4] Plaintiff contends that Amra was not always given all her medications and that she
was not given the medications she needed.  Plaintiff, however, merely cites to nine pages of
computerized medical records that appear to list all the prescription medications Amra
received while at the jail.  In total, Amra received twelve different prescription medications.
On some of the records, there is an entry for "Number of Doses Offered" and another entry for
"Number of Doses Received" and another entry for "Number of Doses Refused/Absent."
Defendants offer evidence that Amra often refused her medications.  Plaintiff disputes that
fact but offers no evidence in support.   Plaintiff also fails to support her assertion that Amra
was not provided the necessary medications or that certain medications were started too late.
Without any supporting evidence, the court cannot find that a genuine issue of material fact
exists.  For example, Plaintiff argues that Amra was not provided her thyroid medication until
two days before she died, but there is no evidence that Amra informed the jail staff that she
was on a thyroid medication–other than a beta blocker, which prescription was continued--
when she entered the jail on February 1, 2011.  There is no medical evidence or expert opinion
suggesting that Defendants should have known about such a medication.

the medications that Amra had in her possession when she arrived at the jail.[5]  She also

scheduled Amra for a doctor sick call the next day.  Foster also entered an order to continue all

of Amra's medications, except Atenolol and Lithium, which were referred to Dr. Wood for

review and approval.  Foster also sent (or thought she sent) a medical record release form to

housing for Amra to sign so that jail medical staff could obtain her complete University of Utah

Hospital records.  For an unknown reason, this records request was either not sent to Amra or

not signed by Amra until March 9, 2011, and therefore not sent to the University hospital until

that date.[6]  Because of Amra's nausea and diarrhea, Foster also ordered Phenergen for nausea,

three times daily as needed, and Imodium A-D three times daily as needed for diarrhea.  Foster

also ordered a clear liquid diet for Amra for the following day and a gastric soft diet for

February 3, 2011.

    After Amra arrived at the Jail on February 1, 2011, Dr. Wood reviewed, approved, and

prescribed medications that were indicated by her prior medical history and her continuing

---

[5]    Plaintiff contends that Foster did not call all the pharmacies from which Amra had prescriptions, but there is no evidence to support this assertion and no record of any additional pharmacies.

[6]  Plaintiff implies throughout her opposition memorandum that this failure to obtain Amra's medical records contributed to her death.  There is no evidence, however, that this failure was anything other than an inadvertent and unfortunate mistake.  It is clear from the evidence that subsequent health professionals at the jail assumed that the records had been requested, and as soon as the error was actually discovered on March 9, 2011, the records were obtained.  Most importantly, however, Plaintiff has offered no evidence that this omission was causally related to Amra's death or how her treatment would have differed had the records been obtained earlier.

conditions within the guidelines of medication policies.  In Dr. Wood's opinion, Amra was prescribed and receiving all necessary medications for her continued health and well-being.

Amra was examined by two different physician's assistants who worked for Dr. Wood. The first exam took place with Angela Epstein on February 3, 2011, and the other was conducted by Richard Russell on February  10, 2011.   When Epstein saw Amra on February 3, 2001, she noted that Amra had been treated and released by the University of Utah Hospital prior to entering the Jail on February 1, 2011.  In Epstein's experience in practicing at the jail, she believed that a hospital would not release a patient and approve them to enter the jail if the patient had any urgent medical needs.  Based on Epstein's examination of Amra on February 3, 2011, Epstein saw no reason that Amra would need immediate medical attention. To the contrary, Amra's vomiting and nausea were resolved, which indicated to Epstein that she was doing better.  Epstein, therefore, discontinued those medications but continued the other medications, which included Atenolol, a beta-blocker.  Epstein also scheduled a follow-up appointment for the following week to await Amra's records from the emergency room, which she believed had been requested.  Epstein never saw Amra after February 3, 2011 nor did Epstein have occasion to review her records until she prepared for her deposition.[7]

---

[7]  Despite Epstein's scheduling of a subsequent appointment for Amra during the following week with another physician's assistant, Plaintiff faults Epstein for not following up with Amra herself, and claims that "this shows knowing indifference on the part of Epstein for not following up on her examination, or following up on medical records that she claims to have ordered."  Docket No. 86 at 20 of 110.   Plaintiff, however, has not provided any evidence to support her position.  The court cannot find that Epstein's actions demonstrated deliberate indifference under the legal standards applicable to an eighth amendment claim.

On February 10, 2011, Amra saw Richard Russell, another physician's assistant.  The examination had been previously scheduled by Defendant Julie Holm, a registered nurse, after the previous visit with Epstein.   In addition, the visit was also requested by Amra because she had submitted a sick call request on the previous day, complaining that she was sick, feeling cold, having pain in her feet and ankles, bleeding from her nose and stomach, and experiencing blood in her stool.  The sick call was triaged the same day, and it was noted that she already had a pending medical appointment scheduled for the next day.

When Amra saw Russell, she reported that her nausea was gone.  She stated that she felt sick, was losing weight, and had tooth pain.   Amra also reported her history of hyperthyroidism and congestive heart failure, as well as the names of her prior medical providers.  Russell noted that she had an irregular heartbeat but that Amra reported that she has had that for ten years.  He also noted that she was teary, which could have been from physical pain or emotional issues.

Russell ordered  lab tests to be performed on Amra's stool, and these tests were to be done three times.  He also ordered a urinalysis.  He noted that he planned to continue monitoring Amra's blood pressure as well as continuing her current medications.   He also stated she could have her own shoes because of a prior foot surgery.   At the time, Russell thought that Amra was stable and did not appear to be suffering from a serious medical need.  She was not dysfunctional and there was no acute distress in any of her conditions.   In Russell's examination of Amra, he saw nothing that would indicate she needed urgent or

9

emergent care.  He testified that if he had observed a need for immediate medical care, he would have called to have her transported to the hospital.  Based on the chart notes and the way the appointment was scheduled, Russell believed that her prior medical records had already been ordered.   Russell never saw Amra again nor did he hear that she had any medical needs that were not being met at the jail at any time.  Russell instructed nurses to make an appointment to follow up within a week.  A follow up appointment was scheduled for February 17, 2011, but it was miscategorized and had to be rescheduled.

On February 11, 2011, Defendant Holm obtained a stool sample from Amra and noted that the stool was almost liquid and gold with particles in it and positive for blood.  Russell, however,  testified that gold-colored stool does not indicate a significant bleeding problem.

On February 21, 2011, Amra submitted another sick call request, complaining of abdominal pain that had persisted for two weeks with blood in her stool.  The sick call request was triaged the same day and was categorized as "urgent."  Someone from the medical unit filled out a sick slip that day and recorded that Amra had a temperature of 100.5 and a blood pressure of 148/80.  Later in the day on February 21, 2011, Amra was seen by Chris Nation, a licensed practical nurse, who noted that Amra had a small amount of blood mixed with her bowel movement, that she complained of constipation, and that she was too embarrassed to tell anyone.  Nation gave her Tylenol, Metamucil, and hemorrhoidal suppositories.

On February 23, 2011, Deputy Hurst told Defendant Robyn Skidmore, a registered nurse, that Amra had complained of blood from her rectum.  In her chart, Skidmore indicated

that Amra would need to fill out a sick slip to receive medical attention.   She was asked to fill out a sick slip because she had refused to attend her doctor sick call that morning.  Amra, however, did not submit a sick slip.

On February 26 or 27, 2011, Amra submitted another sick call request, complaining of shoulder pain.  Plaintiff contends that the request was not triaged until March 1st, and an appointment was then scheduled for March 4th.  This appointment was canceled by the jail and was rescheduled and completed on March 9, 2011.

On March 8, 2011, Amra asked medical staff why she was not receiving one of her medications, Celexa.  She was told by Defendant Tonya Sacco, a registered nurse, that the medication had been discontinued in error and that it should be restarted.

Dr. Wood examined Amra on March 9, 2011 and again on March 16, 2011.[8]  He was scheduled to see her again on March 21, 2011, the day after she died.   During the March 9, 2011 examination, Amra complained of bloody diarrhea and abdominal cramping.  Dr. Wood also noted that her heartbeat was tachycardic and somewhat irregular.  Amra reported that the blood in her stool was bright red with some clots.  She stated that she had had a similar problem at the Salt Lake County Jail but it only lasted ten days.  She also stated that she had a history of congestive heart failure.

These comments and Dr. Wood's personal observations further led him to believe that

_____

[8]  The parties agree that he did not write a record for the visit on March 16 until March 18, 2011.  There are some inconsistencies in the record due to this discrepancy.

while she needed care, she was not experiencing anything close to a life-threatening medical

condition.   Dr. Wood's assessment of Amra's conditions included Goiter, hyperthyroidism,

consistent with Graves disease, that was likely causing her diarrhea, and the bleeding was likely

due to a hemorrhoid.  He concluded that all conditions may be thyroid-related.  Dr. Wood

concluded that she might be a candidate for hemorrhoidal surgery and was preparing to look

at other diagnostic tests, such as a colonoscopy to determine how best to treat her.

Defendant Skidmore assisted Dr. Wood when he examined Amra on March 9, 2011 and

set a follow up appointment for the following week.  During that appointment Skidmore

discovered that a Medical Record Release form had been filled out on February 1, 2011, but

that it had never been signed by Amra.   Skidmore had Amra sign it and then she sent it to the

University of Utah Hospital.

On March 9, 2011, Amra completed an EKG study of her heart.  Dr. Wood received the

results on March 10.  The EKG results showed that Amra had atrial fibrillation (which was

ultimately one of her causes of death), and other heart abnormalities.   Amra's blood was also

drawn on March 9, which revealed a hematocrit of 31.8 and hemoglobin at 10.9.   Her platelet

count was at 116 and monocyte levels at 13.5.  Her TSH levels were at .11 and her T4-Free was

4.89.  Her lithium was .2, and her creatinine level was 0.5.   It is not disputed that many of

these lab results were out of the normal range of reference, but Plaintiff offers no evidence

concerning the significance of the lab results or what the response of the jail should have been.

On March 10, 2011, Amra's prescription for Klor-con was "cancelled" by a jail nurse

12

because Amra "no longer takes Lasix."   Defendant Skidmore states in her notes that Amra

"states she doesn't believe she needs Lasix or [Klor-con] at this time due to not being swollen."

Plaintiff claims that the medical staff had simply failed to renew the Lasix and that Amra

believed she had to stop taking the Klor-con because the Lasix had run out and that the

medical staff did nothing to correct her.  Again, however, Plaintiff offers no supporting

evidence for this theory, nor does she offer expert testimony concerning the potential impact

of this alleged mistake on Amra's health or testimony concerning how critical this alleged

mistake was.  Thus, the court cannot find that there is any genuine issue of disputed fact

related to this issue.

On March 11, 2011, Defendant Holm saw Amra because she was complaining that she

was passing large blood clots and that she was not eating.  Holm noted that the rectal bleeding

was bright red and that Amra was not experiencing pain.  Holm also noted that Amra had

already been scheduled for a doctor sick call and made the notation "Emergency, Do not

reschedule" because Amra was being seen for a chronic condition.  According to Holm, this

notation did not mean that a medical emergency existed but that Holm deemed it very

important for Amra to see the doctor regarding these problems.  Holm believed that because

Amra was passing blood that was bright red, it was most likely from hemorrhoids rather than

from internal bleeding higher up in her digestive system.

Amra's doctor appointment was originally scheduled for March 14, 2011, but she was in

court on that day, and Dr. Wood would not return to the facility until March 16.  Consequently,

13

Amra was not seen until on March 16, 2014.   During Dr. Wood's March 16, 2011 examination,

Amra complained of continued diarrhea and stated that her bowel movements were bloody

and that it had been going on for 3 to 4 months.   Dr. Wood's review of her University of Utah

records, however, indicated that she had diarrhea on February 1, 2011 but no blood was

present.   Dr. Wood further did not believe that Amra was suffering from any medically

significant blood loss.   On February 1, 2011 (from records of the University of Utah Medical

Center) she had a normal hematocrit level of 41.   On March 9, 2011 she had a below normal,

yet not emergent, hematocrit level of 31.8.

 Dr. Wood's assessment again included Goiter, hyperthyroidism, consistent with Graves

disease, that was likely causing her diarrhea and the bleeding was likely due to a hemorrhoid.

He concluded that all conditions may be thyroid related and that her anemia could be due to

hemorrhoid bleeding.   Plaintiff points out that during the visit with Dr. Wood, a guard

witnessed Amra arguing with Dr. Wood and that Dr. Wood terminated the visit.   The incident

report also notes that [t]he inmate continued to argue and I escorted her back to the holding

cell.   No force needed verbal only."[9]   During this assessment, Dr. Wood planned to administer

Tapazole three times daily, and he also planned possible hemorrhoidal surgery "if that is the

---

[9] Plaintiff cites to "Exhibit 34, Bates 17."  *See* Docket No. 72, Mem. in Opp'n at 50 of 95, ¶ 96.  There is no Exhibit 34, however.   After significant searching, the court has determined that this report is found in Docket No. 73-14.   To the extent Plaintiff implies that this fact creates an inference from which a jury could find reckless disregard for Amra's medical needs, the court finds that, without more, it does not.   Plaintiff has offered no expert testimony to suggest that Dr. Wood's diagnosis or treatment plan were so unreasonable that they amounted to reckless disregard.

source of her bleeding." Dr. Wood ordered a follow-up in one week.  In addition, Dr. Wood

ordered the Anusol suppositories three times daily, and noted the need for a colonoscopy.  No

colonoscopy was ever scheduled, nor was hemorrhoidal surgery.  Dr. Wood stated that it was

his intent to schedule the colonoscopy as indicated in his notes, but due to Amra's being an ICE

patient, there were a number of steps to receive authorization for such a procedure.  The

Tapazole was not approved by Dr. Wood until March  18, 2011 and was "checked in" on March

19, 2011.

Dr. Wood testified that had he received any indication that Amra was in acute danger,

he would have sent her to the hospital for more aggressive treatment.  He did not observe any

signs of acute distress or need for emergency care.   At no time while Amra was at the jail did

Dr. Wood hear any reports that she was either not receiving appropriate care or that she

needed more care than what the jail could provide. To the contrary, he believed she was

receiving the type of care warranted by her medical condition.

On or about March 17, 2011, Defendant Skidmore received a call from Deputy Leslie

Levitt stating that Amra had complained of bleeding from her rectum.  Levitt stated that

Amra's cell mates had complained that she was vomiting and defecating all over the toilet and

floors of her cell and that they were begging to have her moved to a different cell.  Skidmore

explained to Levitt that Amra had been seen by Dr. Wood and that he was aware of this

situation and providing treatment.  Skidmore never received any indication from this call that

the complaint was urgent or an emergency.  Skidmore reviewed Amra's lab results from March

15

9, 2011, and saw that some of the levels were off but not to a critical point.[10]  Skidmore called

Dr. Wood and got clearance to redraw Amra's blood to get additional labwork done.

Defendant Lund entered a Nurse Sick Call appointment for Amra's blood to be drawn with the

notation "pls don't resched."

Amra's blood was drawn on March 17, 2011, with lab results dated March 18, 2011.

The hemoglobin and hematocrit levels reported in those results were normal at 15.0 and 42.8,

respectively.  Based upon Skidmore's knowledge, experience, and training, these lab results did

not indicate a concern regarding blood loss or significant ongoing bleeding.  These lab results

gave Skidmore further confidence that Amra was not suffering from a serious medical

condition that would require immediate care and treatment beyond what she was receiving at

the jail.  Amra's blood pressure was recorded as 150/129 and her weight was 119 pounds,

down from 134 pounds on March 9, 2011.  She had lost 15 pounds in 9 days.

Plaintiff contends that these lab results demonstrated that Amra's potassium level was

critical, and her other electrolyte levels were abnormal, signaling heart damage and a possible

heart attack.   Again, however, Plaintiff offers no evidence to support this argument.

On March 18, 2011, Amra had another sick call visit scheduled, but refused to come to

the medical unit, insisting that she must go the hospital.  She finally came to medical after

being convinced by Officer Shelly Stevens.  When she came down, Holm drew Amra's blood.

---

[10]  Plaintiff contends that the doctor should have reviewed the results but offers no
evidence to support this assertion.

Miletic was very emotional and crying, saying she is going to die and that she was being treated

inhumanely.  However, Holm did not observe any critical medical condition that would likely

cause Amra's death.  Although Amra was being very emotional, she did not appear to be

suffering from any type of critical condition that would require hospital or urgent medical care.

  On that date, Holm requested that Amra receive a mental health evaluation because Amra

was so anxious.  It was the first time Holm had seen Amra in such a state.  Amra did not appear

sick, just very, very anxious.  Holm also requested that Amra be put on medical watch due to

her extreme anxiety, complaints of chest pain, and elevated blood pressure.

The blood Amra was passing was bright red, which made jail medical staff believe it was

most likely from hemorrhoids rather than from internal bleeding higher up in her digestive

system.  Amra was scheduled to see Dr. Wood again on March 21, 2011 and Holm believed

there was no medical need for Amra to see a doctor before that date.  On March 18, 2011,

Amra blood pressure was elevated but the rest of her vital signs were normal.  Holm attributed

the blood pressure to Amra's extreme anxiety.  Amra had chest pain but she said it was the

same as she had experienced for years.  There was no indication that she needed emergent

care.  But medical watch with additional monitoring seemed appropriate.

Defendant Garcia's last interaction with Amra was on March 18, 2011. Garcia was called

into the booking area where Amra was housed on medical watch.  Amra complained of chest

pain, but Garcia diagnosed Amra's chest pain as agitation.  However, Garcia took her vital signs

and they were within normal limits.  According to Garcia, Amra did not appear to be in need of

urgent or emergency medical care.  Amra complained that jail medical staff were inhumane,

but did not say why.  She said her parents were coming the next week and they were going to

sue the jail.   Garcia told Amra that she was in the booking area so that she could be watched

and that her vital signs did not reflect distress.  Garcia observed that Amra was angry and

talking down to Officer Beck.  Garcia told Amra that she needed to calm down and relax so she

could go back to housing.  Amra then calmed down and began to appear more at ease.  Garcia

testified that Amra had complained to Garcia twice before about passing blood, but when

Garcia asked if Amra could show Garcia, Amra would say she "flushed it."  Because she never

had objective proof to back up Amra's complaints, Garcia did not document these complaints

in the medical record.

On March 20, 2011, Amra refused her dose of Tapazole at 10:50 AM.  Foster asked a

deputy, who was a qualified EMT to take Amra's vital signs on March 20, 2011 because the jail

was short handed in medical that day.  Foster had never heard any concerns expressed from

Amra or any other staff member about Amra's condition on that date.  It was Foster's

understanding that Amra's vital signs were normal and that she just had some digestion

problems.

On March 20, 2011, the day Amra died, Defendant Zarsoza interacted with Amra

several times while she was in the medical watch cell in the booking area.  According to

Zarsoza, Amra seemed glad that Zarsoza was there and would be checking on her.  Amra told

Zarsoza that she was bleeding, and Zarsoza got her a cup so that she could provide Zarsoza

with a sample.   A short time later, when Zarsoza was working with an inmate in an adjacent

cell, Amra tapped on the window to let Zarsoza know she had a sample for her.   The cup had

20cc of bright red blood, which is roughly 4 teaspoons.[11]   Zarsoza took the sample back to

medical and gave it to the nurses.  They said they had just done blood work and that Amra was

scheduled to see the doctor the next day.

Nurse Sacco saw Amra approximately an hour before she died on March 20, 2011, and

Sacco was likely the last member of the medical team to see her.  Amra did not want to get up,

so Sacco took her vital signs, which seemed to Sacco to be in normal ranges.  Sacco noted that

Amra was complaining that she was dying, that she had not eaten in seven (7) days, that she

was bleeding heavily, and that she had severe abdominal pain.  Sacco also noted that Amra's

color was pale.  Sacco thought, however, that if Amra had not eaten for seven days, it would

have been indicated in her record, and there was no such record.  It was Sacco's understanding

that Amra simply did not feel well because of some intestinal problem and that she was in the

medical area cell so that she could be monitored more closely than the general population and

the medical staff could be more responsive to any medical needs.   Amra communicated with

Sacco by answering questions in a normal fashion, and she moved around in a manner that did

not evidence any acute or urgent medical ailments or pain.   Amra's speech was coherent, and

while she expressed discomfort, she appeared to Sacco to be like any normal person who felt

---

[11]  Plaintiff contends that it was actually 6 tablespoons of blood, but Plaintiff provides
no evidence to support this claim.

sick.  Amra was drinking Gatorade and seemed to be tolerating it well.  Sacco did not believe

Amra when she claimed that she was dying; rather, she believed that Amra was using a figure

of speech.  It never entered Sacco's mind that Amra might actually die while at the jail.

At the time Sacco was assisting Amra, Sacco was aware that Amra had labs taken two

days earlier and that her hematocrit was 42.8.  Such a result is a normal reading and was up

from the lab result taken nine days earlier.  This lab result is not indicative of a person who is

suffering significant blood loss.  Although Sacco is not a doctor, Sacco testified that it is

common nursing knowledge that lab results would show an abnormally low hematocrit if a

person had was suffering significant blood loss.  Sacco, therefore, did not believe that Amra

had suffered significant blood loss nor did Sacco believe that blood loss was the reason that

she was not feeling well.

Sacco did not contact Dr. Wood or obtain urgent care for Amra.  She only ordered a

follow up with a medical provider during sick call.  Nothing else was done to determine the

cause of Amra's blood loss on March 20, 2011.  Sacco stated in her deposition, "At that point

she was scheduled to see the doctor and we were continuing to monitor her for any changes."

There is a video recording of the Jail Booking Area from March 20, 2011.  Beginning at

approximately 6:03 p.m., the video shows Amra getting up and moving around her

cell.  A short time later, she goes back to her bed and appears to be attempting to rest.  A

corrections officer walks by Amra's cell at 6:24 p.m., and she appears to be peacefully laying in

her bed.  At around 6:27:11 p.m., it appears that Amra makes her last movements. However, it

20

still appears that she is just sleeping in the video.  Corrections officers walk by at 6:39:16 p.m.,

6:49:46 p.m., and 6:51:55 p.m.  Amra appears to be sleeping, and her appearance does not

raise the suspicions of anybody passing by her cell.

At 7:13 p.m., Defendant Zarsoza  noticed that Amra's eyes and mouth were wide open,

her hands were up to her side, and her left leg was dangling off her bunk.  Once the cell was

opened, Zarsoza found Amra unresponsive.  Within a minute or so Sacco, came in with the

emergency bag that contains a defibrillator.  She also had Officer Sever activate EMS, which is a

call to the County emergency services to send an ambulance and emergency medical personnel

to assist in providing life-saving measures.  Per Sacco's request, Foster attached the automated

external defibrillator (AED) to Amra, but it advised no shock.  The defibrillator will make a

recommendation about whether or not to shock the patient.  In this case it recommended no

shock, so Sacco continued with chest compressions.   Within about five minutes, Emergency

Medical Services arrived and took over with CPR.  Amra was then taken to the hospital, where

she was later pronounced dead at 8:03 p.m.

An autopsy was completed on March 21, 2011.  The medical examiner concluded that

the "decedent's history is significant for atrial fibrillation which is most likely due to her

hyperthyroidism and in combination with recent blood loss from the colitis most likely caused a

fatal cardiac arrhythmia."

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion of summary judgment, the court views "all facts [and evidence] in the light most favorable to the party opposing summary judgment." *S.E.C. v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012) (quoting *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008)).  The movant must prove that no genuine issue of material fact exists for trial.  *See* Fed. R. Civ. P. 56(a); *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  Accordingly, to survive summary judgment, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial."  *Smart*, 678 F.3d at 858 (quoting *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000));  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

### IV.  ANALYSIS

#### A.  EIGHTH AMENDMENT CLAIM PURSUANT TO 42 U.S.C.. § 1983

Plaintiff may recover in this case for the alleged cruel and unusual punishment of Amra only if Defendants were "deliberate[ly] indifferen[t] to the serious medical needs" of Amra. *Estelle v. Gamble*, 429 U.S. 97, 104-106 (1976); *see also Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  The test for deliberate indifference under the Eighth Amendment has "both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component is met if the harm suffered is "sufficiently serious" to

implicate the Cruel and Unusual Punishment Clause.  *See Farmer v. Brennan*, 511 U.S. 825, 834

(1994) (quotations and citations omitted).  Defendants in this case concede that the risk of

death is a serious medical issue, and thus, they contend that this claim hinges on the subjective

component of the test.

The subjective component  "is met if a prison official 'knows of and disregards an

excessive risk to inmate health or safety.'"  *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S.

at 837).   It is not enough to allege that prison officials failed "to alleviate a significant risk that

[they] should have perceived but did not." *Farmer*, 511 U.S. at 838; *see also Estelle*, 429 U.S. at

105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to

constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience

of mankind.'").

In *Self,* the court found that inadvertent failure to provide adequate medical care is not

enough to state a valid claim of medical mistreatment under the Eighth Amendment, nor is  a

complaint that a physician has been negligent in diagnosing or treating a medical condition.

"Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs.' " *Self*, 439 F.3d at 1230 (quoting *Estelle*, 429 U.S. at

106).

In *Self*, the Tenth Circuit reviewed several of its Eighth Amendment cases and concluded

that "[t]hese cases show that the subjective component is not satisfied, absent an

extraordinary degree of neglect, where a doctor merely exercises his considered medical

23

judgment.  Matters that traditionally fall within the scope of medical judgment are such

decisions as whether to consult a specialist or undertake additional medical testing."  439 F.3d

at 1232.

In the end, the "negligent failure to provide adequate medical care, even one

constituting medical malpractice, does not give rise to a constitutional violation."  *Perkins v.*

*Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999).   So long as a medical professional

provides a level of care consistent with the symptoms presented by the inmate, absent

evidence of actual knowledge or recklessness, the requisite state of mind cannot be met.

Indeed, our subjective inquiry is limited to consideration of the doctor's knowledge at the time

he prescribed treatment for the symptoms presented, not to the ultimate treatment

necessary.  *Self*, 439 F.3d at 1233.

In the Tenth Circuit, the court has recognized two types of conduct that may rise to the

level of deliberate indifference in a prison medical case: "(1) a medical professional failing to

treat a serious medical condition properly; and (2) a prison official preventing an inmate from

receiving medical treatment or denying access to medical personnel capable of evaluating an

inmate's condition." *Id*.   A prison doctor does not violate the Eighth Amendment's prohibition

on cruel and unusual punishment when he "simply resolves the question whether additional

diagnostic techniques or forms of treatment is indicated." *Id*. (quoting *Estelle*, 429 U.S. at 107)

(internal quotation marks omitted).   In other words, "the subjective component is not

satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his

24

considered medical judgment. *Id*. at 1232; *see*, *e.g.*, *Ledoux v. Davies*, 961 F.2d 1536, 1537

(10th Cir. 1992) (noting that types of medication prescribed and referrals to specialists are

generally matters of medical judgment).

An Eighth Amendment deliberate indifference claim "is therefore actionable only in

cases where the need for additional treatment or referral to a medical specialist is obvious."

*Self*, 439 F.3d at 1232.  "And obviousness in the circumstances of a missed diagnosis or delayed

referral, while not subject to a precise formulation, requires direct or circumstantial evidence

that can arise in several different contexts." *Id*.  The Tenth Circuit has identified three such

contexts.

First, a doctor may recognize an inability to treat a patient because of the seriousness

of the medical condition and a lack of expertise, but decline or unnecessarily delay a referral.

*Id*.  There is no evidence in this case that any of the medical care providers recognized their

inability to treat Amra and yet declined or delayed in referring her.

Next, a doctor could completely deny care even though he observes recognizable

symptoms which could signal a medical emergency.  *Id*.  There is no evidence in this case that

any of the medical care providers completely denied care in the face of a recognizable

emergency, given the facts and circumstances in this case.

Finally, a doctor may fail to treat a medical condition "so obvious that even a layman

would recognize the condition." *Id*.  If a prison physician "responds to an obvious risk with

treatment that is patently unreasonable, a jury may infer conscious disregard." *Id*. "But where

a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law." *Id*. at 1232–33.  Accordingly, in this Circuit, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Id*. at 1233 (internal quotation marks omitted).   As long as the prison physician "provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id*.  Indeed, we have limited our subjective inquiry "to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id*.

     With the benefit of hindsight, one might argue that Amra's medical condition was so obvious that even a layman would recognize the seriousness of her medical conditions.  But in light of the undisputed facts of this case, coupled with the complete lack of any expert testimony or other evidence concerning the purported  obviousness of Amra's medical condition or how it should have been treated, the court finds that a reasonable jury could not find that any of the Defendants acted with deliberate indifference to Amra's medical needs. Plaintiff must point to some evidence allowing an inference that Defendants consciously disregarded the possibility of Amra's serious medical needs, and the record does not support such an inference.  There are no facts to support an inference that Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed,

that they actually drew the inference but then nonetheless deliberately disregarded it.  *See*

*Sealock*, 218 F.3d at 1209; *see also Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).

Thus, the court concludes that Plaintiff has not met the subjective prong of the

deliberate indifference test under the Eighth Amendment.  The facts do not support an

inference that any of the Defendants knew about the severity of Amra's condition while

intentionally disregarding it.   While Amra's death is indisputably tragic, and the facts may

create a question of fact pertaining to Defendants' negligence in treating Amra, Plaintiff has

failed to overcome the evidentiary hurdle for a deliberate indifference claim, and Defendants

are therefore entitled to judgment on this claim.

**B.  QUALIFIED IMMUNITY**

Because the court has found that there was no constitutional violation, the court

necessarily must find that the individual Defendants are entitled to qualified immunity.

**C.  FAILURE TO TRAIN AND/OR SUPERVISE**

This claim is asserted against the County and the supervisory Defendants, Sheriff

Thomson, Dr. Wood, and Wasatch Correctional officials.  Because the court has found that

there was no constitutional violation, the court necessarily must find that there was no failure

to train and/or supervise.

"A municipality may not be held liable [for constitutional violations] when there was no

underlying constitutional violation by any of its officers."  *Hinton v. City of Elwood*, 997 F.2d

774, 782 (10th Cir. 1993).   Because there was no constitutional violation by any of the

individually named Defendants or any other officer or employee of the County, the County, as

a matter of law, is not liable.  The same is true for the supervisory Defendants named in this

case.  *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (holding that

supervisory liability, if any, is necessarily premised on a conclusion that the supervisor's

subordinates violated the Constitution).  Accordingly, Defendants are entitled to judgment on

this claim.

### D.  UNLAWFUL CUSTOM, POLICY, OR PRACTICE

Because there was no constitutional violation by any of the individually named

Defendants or any other officer or employee of the County, the County, as a matter of law, is

entitled to summary judgment on this claim.

### E.  CLAIM UNDER ARTICLE I, SECTION 7 OF THE UTAH CONSTITUTION

Plaintiff may not recover damages under article I, section 9 of the Utah State

Constitution unless she shows that Amra's death was caused by a jail employee "who acted

with deliberate indifference or inflicted unnecessary abuse upon" her.  *Bott v. DeLand*, 922

P.2d 732, 740 (Utah 1996), *overruled in part on other grounds* by *Spackman ex rel. Spackman v.

Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 16 P. 3d 533 (Utah 2000).  As with the Eighth

Amendment to the United States Constitution, the deliberate indifference standard for

purposes of state constitutional claims differentiates between inadvertent misconduct, which

does not give rise to liability, and the unnecessary and wanton infliction of pain, which does.

As the Utah Supreme Court has explained:

28

> For example, a physician who is guilty of medical malpractice is not guilty of a
> constitutional violation merely because the victim is a prisoner.  Similarly, a
> prison worker's inadvertent failure to provide adequate medical care would not
> support a constitutional claim for damages.

*Bott*, 922 P.2d at 740 (internal quotations and citations omitted). "Unlike the deliberate

indifference standard, the unnecessary abuse standard has not been widely explored." *Id.*

Under this standard, the main consideration is "whether a particular prison or police practice

would be recognized as an abuse to the extent that it cannot be justified by necessity." *Id*.

(quotations and citation omitted).  "The definition of abuse focuses on needlessly harsh,

degrading, or dehumanizing treatment of prisoners." *Id*. (quotations and citation omitted).

Finally, to recover monetary damages for an alleged violation of Amra's constitutional

rights, Plaintiff must establish, among other things, that Amra suffered a flagrant violation of

her constitutional rights.  *See Dexter v. Bosko*, 184 P.3d 592, 597-98 (Utah 2008).  The flagrant

violation element "ensures that a government employee is allowed the ordinary human

frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a

constitutional violation." *Id*. at 598 (quotations and citation omitted).

For substantially the same reasons that Defendants are entitled to summary judgment

on Plaintiff's Eighth Amendment claim, the court concludes that no reasonable jury could

determine that Defendants are liable under Plaintiff's Utah State Constitutional claim.  For

these reasons, the court concludes that Defendants are entitled to summary judgment on this

cause of action.

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for

Summary Judgment [Docket No. 50] is GRANTED.   Defendants have demonstrated that there is

no genuine dispute as to any material fact and that they are entitled to judgment as a matter

of law.  Accordingly, Plaintiff's causes of action are DISMISSED WITH PREJUDICE.  The Clerk of

Court is directed to enter judgment and close this case.

DATED this 4th day of January, 2016.

BY THE COURT:

DALE A. KIMBALL
United States District Judge